and the U.S. is appearing as an amicus. Good morning, your honors, may it please the court. My name is Joseph Davis and I represent the appellant, Coach Nick Rolovich. I'm going to aim to reserve about a minute of my time for rebuttal. As the court is aware, we've also given some of our time to amicus the United States, which intends to focus on the errors in the district court's sincerity analysis. I'd like to focus on two different errors, if I could, your honors, each of which independently warrants reversal. First, as to Rolovich's failure to accommodate claim, the district court gave short shrift to the Supreme Court's decision in Groff, which makes undue hardship a context-specific, fact-intensive inquiry that here should have gone to the jury. Second, your honors, and perhaps even more importantly, the district court entirely overlooked Rolovich's other Title VII claim for disparate treatment. That claim is not subject to an undue hardship defense. And on that claim, the only question is whether a reasonable jury could conclude that religion was at least a motivating factor. That's not the only question. The district says that he didn't plead it. Yes, your honor, but the district... That's a preliminary question. Was it sufficiently pleaded? That was what the district said it was not. Well, the district court didn't actually address the Title VII disparate treatment claim. That's WSU's theory on appeal, and the theory is wrong, your honors. The disparate treatment claim was pled in the complaint at 6 ER 1234 to 35. It was then litigated in the summary judgment papers. So WSU said, you know, give a summary judgment on the Title VII claim. And we said, no, no, undue hardship is not a total defense to our Title VII claim because we have this disparate treatment claim. And we cited the same discriminatory comments that we're talking to you about on appeal, your honors. We cited some of the same disparate treatment cases that we're citing in our briefs here. And then WSU responded and said that that evidence isn't good enough to get to a jury. Now, we disagree with that, obviously, but the point is that the issue was fully teed up for the district court, and then the district court just ignored it for whatever reason. But I think, and I'm happy to discuss that waiver issue more, your honors. But I think there's a reason that WSU is so insistent on having you not look at the disparate treatment claim, because under ordinary Title VII principles, that disparate treatment claim obviously ought to go to a jury. Again, this court has repeatedly held that even a single discriminatory comment suffices for a Title VII plaintiff, whether it's a race case or a sex case or whatever, a single discriminatory comment suffices to get over the low bar of summary judgment. And here we have a lot more than a single comment, and I think that sets this case apart from any of the other vaccine cases that this court has seen. So first, when Rolovich told Defendant Chun that he had to put his faith and his family above football, Defendant Chun responded and said, your beliefs are making you incapable of leading this team, and he compared his beliefs to those of religious cults. Later on, when WSU's president and board chair learned that Rolovich would be seeking a religious exemption, they were, in their words, pissed, disappointed, so angry they couldn't see straight. They mocked what they called his devoted religion and said he was probably searching for one on the internet as we speak. And they viewed the mere fact of his opting to use the exemption process as itself a failure to display leadership and an incredibly massive letdown on his being in it for Cougar Nation. Now, I think... Can I ask you this? I'm sure you appreciate the fact this is an unusual case. The record that I have reviewed suggests that well before your client asserted a religious claim, he was basically pooh-poohing the whole idea of the vaccination based on totally extraneous views, medical views and the like. What are we to do with the timing of this? I mean, if this is a straight out medical claim, fine, whatever, but that doesn't seem to be what the record shows. Help me with that, please. Yes, your honor. So the timing cuts entirely in our favor, and that's because WSU is simply wrong. That religion never came up until after the governor amended the proclamation. The record shows that through internal communications, that Coach Rolovich was talking to his priest, the campus priest. He was talking to his bishop. He was discerning his religious views on the vaccine in July 2021, which is before the proclamation was amended in August. My understanding is that the religious claim is, I'm a Roman Catholic and my Roman Catholic faith tells me I can't get vaccinated. That's the claim? Yes, your honor. That's uphill work, given that it's the Catholic Church and there are an awful lot of Catholics who are vaccinated. Well, your honor, frankly, I don't think that a court really ought to be in the business of saying whether Roman Catholics should be vaccinated or not. The question is, is that a sincerely held belief for Mr. Rolovich? He was basing his exemption request on the National Catholic Bioethics Center, citations to the Catholic Catechism, to Catholic theological documents. And the question for this court is whether he sincerely believed that's what his faith required. He was supported by his own priest in that understanding, and in fact, it was his priest that encouraged him to seek a religious exemption after having these spiritual conversations with Rolovich and understanding his objections in terms of Catholic teaching on conscience. So I think this would be a really strange case, your honors, for you to say not only that this was an insincere claim, but it was a reasonable jury couldn't even find it sincere. That would be very odd because we have sworn testimony, we have internal communications with the priest, and the timeline, like I said, your honor. The harder question for your client, I think, I mean, I understand what you're saying, and that's a bit of a close question, I get it. Is the accommodation, I mean, the nature of his job entails a lot of personal to personal contact. So why is the university wrong with respect to accommodation? It's wrong with respect to, so it's a jury question on accommodation, your honor. Rothmick, tell me, why is it a jury question, because it seems to me there's some fairly strong arguments on this point against your client. Question is whether they're strong enough to get to the jury. Yes, your honor. So the reason is that we're talking about an overwhelmingly vaccinated university, a 95% vaccinated university. Coach Rolovich's job was to coach young, healthy student athletes in that overwhelmingly vaccinated context. Did he also meet with alums? He did meet with alums, yes, your honor, often. Did he also meet with recruits? Yes, well, no, your honor, but that's because of NCAA regulations that- The answer to that question is no. So, sorry, to be clear, Judge Hawkins, I'm not saying- You're a coach, you're a major university, and he's competing against the likes of Stanford and UCLA and UW, and you're telling me he doesn't recruit? He was four and three at the time he was fired, your honor. But of course he recruits, your honor, that's not what I was saying. My point was the other side has tried to say he couldn't meet in person with the recruits, and what the record shows is that he was prohibited from meeting in person with recruits during the entire period up until the time that he was fired for reasons having nothing to do with his vaccination status. So my point was just on that narrow question of could he do his job without being vaccinated, and the answer is absolutely yes. But I think- Counsel, forgive me, the answer you just gave seems directly contrary to the record. As I understand it, the concern was he could not do his job as the head coach, as Brother Hawkins has talked about there, and in fact, you're talking about a multimillion-dollar business that competes against other schools, and he's basically saying, hey, I can't be the head coach. What am I missing? I think you're missing that, I mean, we were halfway through the 2021 football season. He was four and three. Not a single game had been impacted because of COVID issues, so he was obviously successfully doing his job. As to your point about multimillion dollars, I mean, I think Groff speaks directly to this issue, right? Because what WSU is saying is our donors objected to your not being vaccinated, therefore we had to terminate you, and what Groff says is that adverse customer reaction is just categorically not a cognizable source of undue hardship, and that's a really important principle from Groff. And you get that from Groff? Yes, Your Honor, Groff says adverse customer reaction is not a cognizable source of undue hardship, and it explicitly disapproves one of the old de minimis undue hardship cases that had found undue hardship with respect to a sick employee at a restaurant who had a beard because of his religion. The customer said, we don't like the beard, we think that's unsanitary, we're not going to go to your restaurant anymore. Restaurant fired him. Groff says that's not a source of undue hardship. When an employer is in this position, the employer is supposed to explain its accommodation obligation. It's not allowed to turn objections by donors or customers into a sort of heckler's veto, but I want to underscore that you don't even have to reach the undue hardship question here, or you could disagree with me on undue hardship, and I don't think you should, but this case would still be a jury case under ordinary Title VII principles on disparate treatment because we have all those comments, and then on top of the comments, Your Honors, we have, they say that the real reason was this undue hardship determination, but the chronology just does not bear that out because we know for a fact, or at least a reasonable jury could conclude, that WSU had already determined that it was going to fire Rolovich for not getting the vaccine long before he even submitted his exemption request, much less before it made its undue hardship determination. I mean, from the very start, Defendant Chun told Rolovich that if he didn't get the vaccine under the new mandate, he could be expected to be fired with cause. If he sought a religious exemption, then Chun would forever question his character. The day that they found out that Rolovich was seeking an exemption, the President and the Board Chair said that it's time to take the reins and no longer protect Nick, who has tarnished WSU's brand, and then 11 days before Rolovich filed his religious exemption request, Defendant Chun already knew that it was going to be denied. He said that Rolovich had put himself in a bad position, and that WSU was about to teach a great lesson to future coaches about what they can and cannot do. So the basic point is, a jury could disbelieve the idea that undue hardship was the real reason for WSU's action, and that just makes it a jury question. You don't have to decide that, but that's what juries are supposed to decide. There's competing factual narratives here, and the question is, what's the inference to draw? You've come to the end of your 10 minutes. In fact, you've gone over a little bit. You asked to reserve one. We'll give you one. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court, Kelsey McGee on behalf of the United States. Judge Smith, can you hear me okay? I can, and I'll start right off with a question. Why is the federal government involved in this case? This is an amicus curiae. Your Honor, the government is here to enforce its mandate, for the Department of Justice and the Civil Rights Division, to enforce its mandate to enforce Title VII against state and local governments, and we are here to ask this Court to uphold a consistent application of Title VII, where for a claim to survive summary judgment on Title VII for the sincerity prong, a plaintiff needs only to prove an honest conviction, and the other disputed facts should go to a jury. The Court here ignored several facts in the record that showed that Mr. Rolovich is a committed Catholic with ties back to his childhood, through high school, through college, having his own children baptized, and when all of these events started to happen, where did he go? He sought religious counsel. He looked to the teachings of his church, and he made a decision based on his religious conscience, which through the Catholic catechism, looking at his declaration attached to his request for religious accommodation, the church says to follow a religious conscience is to follow Jesus himself. That can be found in the record, Your Honor, I believe it's at about 1092. His church does not compel him to take a vaccine. It does, however, compel him to follow his religious beliefs. Help me understand what you just said. His church doesn't compel him, but why then does he have a bona fide religious objection? Because the church doesn't state that everybody has to be vaccinated, nobody has to be vaccinated, whatever. There's no ultimatum there. There is room for free will. So then the church, in your view, is neutral as to whether or not he can or cannot refuse. I think that's what I heard you say, but if that's not what you said, help me. I don't know that the church is necessarily neutral, Your Honor. I would say the church gives guidance in looking to the reasons stated in his declaration attached to the religious accommodation request. The Catholic church, through I think it's medical, religious, ethical guidance, states looking to the pros and cons. And if a decision is following a religious conscience that is founded on Catholic teachings, as here, when we're looking to abortion issues and concerns, it compels him to follow his religious conscience. And it was clear to- Well, let me make sure. Your position is he's following his religious conscience and the Catholic church permits him to do that. He's following his religious conscience that is based on his own searching, as well as on the teachings of the Catholic church, and the Catholic church believes in the value of autonomy. In that- But the Catholic church is not telling him, as I understand it, you must decline this because of the abortion-related issues. Is that right? That is correct. The Catholic teaching is that somebody can refuse something because it is based or it is founded, in this case, looking at the fetal cell lines in abortion, that a person who is following the Catholic teachings of abortion concerns can refuse a vaccine. And that's something that, especially looking at abortion fetal cell issues with the COVID-19 vaccine, this court has said that it's a specific religious reason that should be protected under Title VII. What if we view the record as saying that your client really wasn't even concerned about the religious aspect of this until later on, he kind of got his tit in the ringer and needed an answer and he got the church involved. Is that a false understanding? I think that that is something that a jury should decide on the issue of individual credibility. I would dispute that that is- Your co-counsel responded to that. I would say that it's not fatally flawed looking to Callahan v. Woods, which is a longstanding case in this court, which says the issues of mixed religion and secular views on something doesn't kick out the religious claim itself, that the religious claim should still be able to have the weight afforded to what the religious belief actually is. Recently, the Fifth Circuit decided a very similar case to this case on summary judgment, Wright v. Honeywell International, Inc. And the court was very explicit there following along the lines of Callahan, which says that the sincerity of a person's religious beliefs is a question of fact to each case. And the fact that he gave an individual reason for a vaccine refusal does not show his belief is merely preferred practice. It shows that his vaccine refusal is grounded on both religious and non-religious reasons. We would dispute WSU's claim that abortion is necessarily derivative of some sort of mistrust of the government. There are many cases across the circuits that have held specific cases like this are to be protected under Title VII. We would ask this court to look to a consistent reading of Title VII, as there was evidence that was clearly ignored by the district court in this case. And I will yield my time, or I believe I'm out of time. You are out of time. Thank you very much. Thank you. Appreciate your argument. Thank you. Good morning. May it please the court, Zach Mikalis for Appalachia's Washington State University and Patrick Chun. This court has now three times in Peterson, Williams, and Bordeaux addressed failure to accommodate claims arising in the COVID-19 vaccination mandate. Each time, the court skipped over the prima facie case, proceeded directly to undue hardship, and affirmed the district court because the unvaccinated employees substantially increased risk of spreading a deadly virus to their coworkers, members of the public, and others represented an undue hardship as a matter of law. The same result should obtain here for three key reasons and commonalities with those cases. First, the undisputed evidence shows that Rolovich's job as WSU's head football coach required hundreds, if not thousands, of close in-person contacts every single week. More than the TV actor in Bordeaux, more than the hospital workers in Williams, and more than the firefighters in Peterson. Second, the undisputed evidence showed that when WSU considered Rolovich's accommodation request, it consulted the available public health guidance at the time, showing that unvaccinated persons had orders of magnitude greater risk of contracting and transmitting COVID-19. Third, the undisputed evidence showed that alternative strategies, like masking and testing, were ineffective and inadequate to address the significant transmission risk posed by an unvaccinated employee in Rolovich's highly interpersonal job. So you're asking us to agree with the statements you just made in every respect, even if we look at this record and say, this man has a sincere religious reason for not being vaccinated? We agree that the sincerity question presents a closer call, but that the undue hardship question is clearly dictated by this court's precedence. So like the court has done every other time it's encountered this, we suggest simply skipping over, assuming without deciding that he has a sincerely held religious belief for the purposes of summary judgment, and going right to undue hardship, which is a complete defense on the failure to accommodate. So from your perspective, our court precedent bind us in basically relying upon the undue hardship prong, if you will, if we don't get to the religious one, from your perspective. The court precedents don't require you to reach the religious prong, Judge Smith. That's correct. I wouldn't say that you're bound in the sense that this is exactly the same factually on point with the other cases. But the legal principle, which is that an employee's significantly an unvaccinated employee with highly close contacts in his job, which Rolovich has concededly has his increased risk as a matter of science, which is undisputed on this record, presents an undue hardship as a matter of law. And that goes all the way back to the court's case in Batia v. Chevron. But just to be clear with respect to the two claims here, one the religious based and the other one, whether the accommodation, I don't hear you saying that the district court was wrong as to religious belief. It's just you think it's easier for us to do it based on accommodation. That's exactly right. And, you know, I'm happy to talk about sincerity. I think if you look at the timeline, which is laid out very clearly in our reply statement of material facts, there's a lot of kind of throwing things out in the record. But the reply statement of material facts incorporates Rolovich's arguments and evidence and ours. And that can be found in the record at 2 ER 46 to 194. But given the limited time here today and given that undue hardship is so clearly dictated by this court's precedence, my preference would be to focus on that area. And I'm happy to approach any part of it. I think it's worth pointing out because I heard counsel reference the 95 percent argument. So they have this theory that's new on appeal that clearly was not raised in the district court, that that there was a herd immunity at WSU because they say 95 percent of its student and faculty and employee population was vaccinated. First of all, that's just not supported in the record. There isn't any evidence that of that 95 percent. But let's just say it was. That's a fundamentally scientific proposition. We had two epidemiologic and public health experts, medical doctors, one who led you jobs, covid response, the other who led WSU's covid response. And they each said that eight unvaccinated football coaches, because you have to consider them all cumulatively, the cumulative risk presented a significant danger of contracting and spreading covid-19 in October of 2021. There's no scientific evidence from Rolovich who didn't have a scientific expert to rebut that. And in his brief, he says, well, epidemiologists said that, you know, herd immunity was there, but he doesn't have an epidemiologist who's testifying for him. There was one who he a declaration that he attached to his complaint, but he wasn't identified as an expert. So if you look at the Seventh Circuit's decision in Castle, which we cite in our brief, and it says, look, it's difficult to estimate when herd immunity might emerge. You need scientific experts for that. If you look at Judge Cartwright's decision in the FM off case, she explicitly rejected the plaintiff's argument that herd immunity might protect the employee because it must be the subject of scientific testimony. Let me ask you this. Were members of the football team required to be vaccinated? Yes, they were. Your honor. It was covered by a separate gubernatorial proclamation that required students to be vaccinated subject to, and this was mandated by law, religious or medical exemptions. So 14 of the players requested religious or medical exemptions because of religious belief or a medical contraindication, excuse me, more than that were requested. But 14 were approved. So 14 of the 120 players, roughly 120 players or so remained unvaccinated. Now, Rolovich points this out, and this was preserved below, so I'll address it. This relies on multiple false equivalencies between Rolovich's accommodation and the student athlete's exemption process. So the first is just the obvious difference between an accommodation, which is a creature of employment law, and a student exemption from a vaccine mandate, which are quite common. And as far as I'm aware, I've never heard of a student religious exemption from a vaccine mandate requiring some sort of reasonable accommodation process where you look at, well, what extracurriculars does this student have? Is he really a danger? It's just that either you get the exemption or you don't. And the court recognized that in Doe v. San Diego Unified School District, that obvious difference. The second and maybe the most important distinction is that WSU didn't have the authority to kick football players who had legitimate religious or medical exemptions off of the team once they were approved. The governor's mandate for students, which was Proclamation 2012, as opposed to the proclamation for employees, which was 2114, the student mandate didn't provide for any accommodation process. It said, once you grant an exemption, it's granted, and that's it. They have to abide by various safety precautions like masking, but that's it. And it's undisputed that the athletics department had no role whatsoever in the student exemption process. In your view, how are we supposed to deal with the disparate treatment claim? Your Honor, the disparate treatment claim was clearly not raised below. And I understand, you know, counsel on appeal, they see an attractive issue that they wish had been brought up below. But if you look at the record, it's not there. Start with the complaint. Counsel cited ER 1234 to 35. That's the second amended complaint. It's identical in language to the first amended complaint, which is at 5 S.E.R. 119 to 20. And the first amended complaint, just in the Title VII claim, it tracks the failure to accommodate language really closely. It talks about the sincerity prong, it talks about the notice prong, it talks about undue hardship. Yes, it sprinkles in some language about intent. But a fair reading of that, and I'd cite the Coleman case, is that it's a failure to accommodate claim. But here's the most important part. Let's just say, for the sake of argument, that he intended to plead a disparate treatment claim, that maybe you could read the original complaint to assert a disparate treatment claim. In the motion to dismiss briefing, WSU said, there is no disparate treatment claim here. We're only dealing with failure to accommodate. And not once, not in oral argument on the motion to dismiss, not in his amended complaint, which is, again, identical in all material respects to the original complaint, at no point in the litigation did Rolovich say, oh, by the way, we're actually asserting a disparate treatment claim here. So if you'll forgive the football analogy, this hide-the-ball approach is not how litigation is supposed to work. And in the case McCrae v. Wilkie, it's a Seventh Circuit case, the exact same thing happened, where the plaintiff said, oh, no, I meant to plead a disparate treatment claim. And the court said, but you need to point out, if you think your opposing counsel is in error and has overlooked one of your claims, you can't just wait until the appeal to say, oh, yeah, there's a disparate treatment claim in here. So if you look at all the evidence in the record, it's all geared towards failure to  When the statement was made, there is no disparate treatment claim, was there a response that said, yes, there is?  No. And so that was in our reply brief. So they might say, oh, well, we didn't get a response. But we had an entire oral argument. It lasted, to my memory, 30 minutes or so. And the plaintiff never, he had a chance to correct it. But more importantly, once we said there is no disparate treatment claim here, and that's at 5 S.E.R. 916, he then moved to amend his complaint to add a new claim. That's the willful withholding of wages claim that he added in the second amended complaint. That would have been the time, if you wanted to add a disparate treatment claim, to add that claim as well. So there just isn't a disparate treatment claim here. But, you know, the kind of hide the ball strategy is deceptive. And I'd also point out that if there is a disparate treatment claim here that somehow the district court overlooked, that's a problem for appellate jurisdiction, because that means there's an unresolved claim still in the district court. And that's a problem for all the rest of the claims. So we think it's much simpler and accurate for the court to simply hold there is no district treatment claim pleaded. And even if there was, plaintiff forfeited it by not correcting us at the motion to dismiss stage or at any point thereafter. On the merits of the disparate treatment claim, and I'm happy to address it or move on or back to undue hardship, I'll just say this. The timeline is fairly clear. Rolovich asserted vehement objections to vaccination starting in spring of 2021, April of 2021, had discussions with Mr. Chun about it. It was very and it clearly caused a contretemps, to use your words, Judge Fletcher, throughout the spring and summer of 2021. But there was no hint of him having a religious objection. In fact, he freely admitted that he did not have a religious objection to your friends on the other side, say that alone suggests that this is a fact question for the jury. Well, no, not when it's undisputed that he did not come to his kind of epiphany moment until August 17th, 2021. That's absolutely clear from his own deposition testimony and from the statement of material fact. So if and but his law professors would say, are you in the or the he a jury could say we don't believe you because you raised it so late. Or they could say, you know, this guy started studying and looking and talking to religious leaders in the light. And he really believes that vaccination is against his deeply held religious beliefs. I articulated it poorly. So it's an undisputed fact that he didn't reach his epiphany, that his conscience as a Catholic prohibited from vaccination until August 17th, 2021. And yet his same theory is that WSU before that hatched the quote unquote Rolo strategy to fire him. So under the Lubetzky case in the 11th Circuit and many other cases that we say on page 55 of our brief, an employer can't intentionally discriminate against a person on the basis of their religion unless the employer knows what their religion is. And here, under Rolovich, his own theory of the case, WSU had hatched its plot to terminate him before it knew about his religion. Well, this is not a claim that they discriminated on the basis of his religion. This is a claim on the other side that his religion exempts him from the mandate. Well, that's the failure to accommodate claim, right? So I mean, there are two different tests governing, which is why it's so important to make clear from the get-go which claim you're preaching because there are different elements and different defenses that govern each claim. So the evidence in this case is geared towards the failure to accommodate claim. And I'd like to return to that because there's one really important point that I want to make. What makes this case even more compelling than Williams in the hospital context and Peterson in the firefighter context is that there's also an economic hardship. And we've long dispelled the idea that health and safety danger by itself doesn't constitute an undue hardship. And that's clearly present here. But WSU also has the significant economic hardship of risking canceled, forfeited football games, which is undisputedly would have cost WSU between $1.25 million and $1.9 million per game. And if there were an outbreak, it probably would have canceled two games just like it did in the 2020 season. Now, Rolovich says that's just pure speculation where you had this herd immunity. Again, no scientific evidence to support that. But he ignores that WSU's football team had the lowest vaccination rate in the Pac-12, just 80 percent. It was the lowest vaccination rate of any intercollegiate athletics team at WSU. Wait a minute. I thought the numbers that you just gave me in terms of who had an exemption don't count. That doesn't track 80 percent. Before the mandate. So this was this was it was 80 percent when it was all voluntary. You're right. Once only 14 players had exemptions, then it rose up. But again, these processes were happening on separate tracks. So the evidence there's no evidence that that somehow Chun or the athletics department could have predicted which students are going to get religious and medical exemptions or not because the athletics department simply had no control over that. And by the time Mr. Rolovich was terminated, what was the vaccination rate among the team? I don't think that it's that I don't think it's anywhere clear on the record, because again, these were happening on separate tracks and separate deadlines with separate decision makers. Some of the student athletes appealed the initial denials and were successful. Others weren't. But so the 80 percent number may or may not be applicable. Well, it's applicable. And here's why. Because and I'm exceeding my time, please, please, please. Under under Peterson and Williams, the court looks to what the what the decision maker, what the employer knew at the time that the accommodation decision was made. And here the evidence is that and this was well publicized. The decision makers knew that WSU's football team had the lowest vaccination rate in the Pac-12 and that its staff vaccination rate was even lower, just 75 percent because so many of the coaches were following Rolovich and not getting vaccinated. So that presents obviously there's no herd immunity in this close knit group of people that Rolovich is interacting with every single day. And the best evidence of Rolovich is job duties. And to give you a real sense of how interpersonal his job was, is in three places in the record. The declarations of Jake Dickert, his successor, Pat Chun, the athletics director, and Anne he doesn't have anything in his testimony at all to rebut the close contacts of his job. And he doesn't really even deny it today. Could I have 30 seconds to sum up, please do. The unrebutted evidence of WSU's experts shows that the covid vaccine saved two million lives in the United States and had more government employers adopted mandates, hundreds of thousands of more would have been saved. But we recognize they were not without costs. And it is deeply regrettable that many employees who had sincere religious objections or medical contraindications to vaccines could not continue in their jobs because of the close contacts that would endanger the public. But Rolovich is no different from firefighters. That's your 30 seconds for that. For those reasons, we asked the court to affirm. Thank you. Why don't we put two minutes on the clock? He went two minutes over. Thank you, your honor. I appreciate it. I just have three brief points in rebuttal. First, your honors, there is a reason that my friend on the other side is pounding the table trying to prevent you from looking at the disparate treatment claim. That's because the disparate treatment claim plainly should go to a jury under ordinary Title seven principles, totally irrespective of their undue hardship. And did you plead that? Did you plead that? Yes, your honor. And in fact, my friend on the other side said the allegations were sprinkled into the complaint as he conceded. Where?  At 6 ER 1234 to 35. That is our Title seven claim in the complaint. And what it says is that WSU's disapproval of Rolovich's religious beliefs was one of its motives for terminating coach Rolovich. That is a disparate treatment allegation. Earlier in the complaint, in the factual narrative there, we recount the discriminatory comments made by Sean. The ones that we knew about before discovery are recounted in the complaint. So those those those comments are only relevant to a disparate treatment theory. They're not relevant to an undue hardship theory. That's the reason that they're in the complaint. So that's the second amended complaint, which is the operative one. My friend on the other side, sort of complex theory about the first amendment complaint and what happened at the motion to dismiss stage is irrelevant, really, because the second amendment complaint is the operative one. WSU answered the second amendment complaint. They did not move to dismiss in their answer. They denied the allegation about the discriminatory motive, and then they made it an affirmative defense, which is that we had a legitimate nondiscriminatory reason. That is a disparate treatment affirmative defense, not an undue hardship affirmative defense. At the summary judgment stage, Your Honor, counsel just told you that when they pointed out we didn't have a disparate treatment claim, we didn't dispute that. That is objectively false. That's wrong. At the summary judgment stage, they said, Judge Rice, give me summary judgment on the Title seven claim because we have an undue hardship. And we said, no, number one, you don't have an undue hardship. But number two, even if you even if you did, we have a disparate treatment claim that is not subject to an undue hardship defense. We've alleged discriminatory motive that itself should go to the jury. And then they responded to that in their reply. So this is, I mean, this is more than enough under this Court's precedent, like the Alvarez case cited in our opening brief. It was at least part of the case. Judge Rice didn't address it. That doesn't mean that there's a jurisdictional issue, Your Honor. He granted summary judgment to the defendants on all claims, entered a judgment against us. So obviously there's jurisdiction. I'm over, but very briefly, Your Honor, my one of the points, my two other points I'd like to make is even if you if you find there's a fact question on disparate treatment, there's necessarily also a fact question on the state law claims because an illegal termination is not a just cause termination. That's black letter Washington law. And then finally, there are cases about hospital workers and firefighters or about emergency med like people whose jobs it is to provide emergency medical treatment to the sick and the vulnerable. But it's nothing to do with the case about young, healthy, vaccinated athletes. OK, thank you. Thank you. Thank you, Your Honor. Thank both sides for your helpful arguments. The case of Relevich versus Washington State University is now submitted.
judges: HAWKINS, FLETCHER, SMITH